Please call the first case. Good morning. May it please the court. When it's your turn, you can just tell us your name. Thank you. May it please the court. Jonathan Golkin from Johnson & Bell with my partner David Magsian, my client, co-counsel Ellen Dittish, our general counsel for the appellants, defendants, Wilmette Real Estate and Management Company and BCH Tower LLC. Collectively, I will refer to them as the WRE defendants. The defendants bring this appeal pursuant to Illinois Supreme Court Rule 301. My final judgment entered on a jury verdict that was rendered on March 27, 2012. The verdict entered in favor of the plaintiff, Mary Pat Dorner, as special administrator of the estate of Melissa Dorner, deceased and against the WRE defendants and Roberto Ramirez with 10% fault attributed to the WRE defendants. After final judgment was entered, defendants filed a written post-trial motion for J&OV. In the interim, they filed a motion for directed verdict. The trial court denied both those motions and the defendants are here to fight and argue against those motions that were denied. Just briefly with respect to the facts, your honors, this is a death of a young woman that was killed in her apartment by a co-tenant living on a separate floor. Roberto Ramirez was a authorized tenant of the building in question that was owned and operated by the WRE defendants. Mr. Ramirez was ultimately apprehended, charged, convicted and is serving time in prison for his actions. Melissa Dorner's murder was found, occurred inside her apartment unit. There were no signs of forced entry and the crime was investigated by the police accordingly. Broadly speaking, the issues before your honors are simply whether the trial court erred when it denied the WRE defendants motions for direct verdict and motions for judgment, notwithstanding the verdict. When the evidence overwhelmingly showed three things. First that the defendants did not owe a duty to the plaintiff decedent to protect against the independent criminal acts of third parties. Second that the WRE defendants did not assume a duty to protect the decedent Melissa Dorner from the protection of criminal acts of third parties. And third, that the action of Roberto Ramirez in killing Miss Dorner was entirely unforeseeable, thus negating the required element of proximate causation. As your honors are well aware in Illinois, the longstanding rule is that landowners and landlords are not responsible for the independent criminal acts of third parties absent the showing of a special relationship. In Roe versus Bank of Lombard, the Illinois Supreme Court indicated that the relationship of a landlord tenant does not fall within the four recognized special relationships to require a duty of protection. Now the Roe court talked about security measures. All right. Obviously you've got a big building here. It has some kind of security depending on whether it's a doorman or alarms or anything else. This case is really about the credit checks and the pre-screening of the tenants. How does this fit into the security measures that our Supreme Court talked about in Roe? I would respectfully submit your honor that this case is completely distinguishable from quite frankly, not only the Roe decision, but any decision that has been handed down by Illinois courts right now. And you were correct. Essentially what the plaintiffs contended and advanced by way of argument at the trial level was that we, the WRE defendants had some procedures and policies in place by way of a, in part, a credit check, in part by following up with past landlords, employment history, verification of income and so forth. The plaintiffs advanced at the trial court that we were, we didn't comply with our internal unwritten policies and procedures regarding the application process for our tenants. Specifically, the plaintiffs advanced the argument that we as the WRE defendants, this handled the application of Roberto Romero as the ultimate murderer in this case. Specifically, the plaintiffs argued that we conducted background checks, criminal background checks. The, the evidence, however, showed that we never submitted any kind of criminal background check, that our application process was simply a credit check to ensure the credit worthiness. Well, Mr. what do you pronounce your last name? It's kind of a conflation of arguments, isn't it? The plaintiffs are arguing that by the application process and the kinds of questions that you asked in the application process and so on, a reasonable person could conclude that some of those were being done for the purposes of safety and security. I mean, that was part of what they were suggesting. You on the other hand argued, no, this was strictly business. We were doing this to determine people's credit worthiness and whether they could pay the rent. And so those two things obviously are not the same. They're worlds apart. If you're right, then you're right. And if they're right, then they win. So what is, you know, how do we reconcile those two because they're making a very distinct and different argument from the one that you're making. And couldn't a reasonable person come to the conclusion that the kinds of questions that were being asked on this application process would be for some purpose of security? I assume that your clients would want their prospective tenants to think that the building is secure. So one way of doing that would be to ask certain kinds of questions. Wouldn't a reasonable person, couldn't a reasonable person conclude that that was the reason for some of those questions? Your Honor, thank you. And certainly that could be the case. And let's reference what we did by way of credit checks. Given the plaintiff, the non-moving party here, all benefit of doubt and assume that the credit check can reasonably be construed as a check on someone's criminal background. It wasn't just the credit check. There was a box on the application form that had a question as to whether or not the person had ever been convicted of a crime. I mean, would that, that's the kind of thing that I think a prospective tenant would look at and wonder, well, why would they want to know that? Unless they're trying to keep the riffraff out. And that's, that's a great question, Your Honor. The reality of the situation here, assuming that we were checking for criminal background, the evidence adduced at trial during the entire trial, adduced no evidence that Roberto Ramirez had any criminal history. So in the event that we were checking criminal background, there was no evidence adduced at trial that Mr. Ramirez had any criminal history. Take it a step further. Assume that we did a credit check, a criminal background check, that Mr. Ramirez actually did have a criminal history. There was no evidence adduced at trial that the WRE defendants would have precluded him housing on the basis of a criminal history alone. Furthermore, there was no evidence at trial by way of an instruction by the court to the WRE defendants could have precluded Mr. Ramirez's housing. You know, this is no different than a situation where someone in college gets into a bar fight and to suggest that, you know, that they're never forever allowed to run a house, I believe is contrary to any law that I have come across, Your Honor. But the reality of the situation is this criminal background issue that was made in advance of trial is essentially a red herring because there's no evidence adduced or advanced by the plaintiff or anyone for that matter that Mr. Ramirez had a criminal history. Now with respect to the other procedures as to the occupancy limits, I'm just going to touch on this very briefly. Counsels on behalf of the plaintiff, they advanced the argument that we had internal unwritten policies on occupancy and that the situation called for two heartbeats per room in a studio apartment that Mr. Ramirez was living with two other gentlemen and thus making three people living in a studio apartment. Preliminarily there's no evidence that the WRE defendants had any knowledge whatsoever that they were living three people in a room. But more importantly, Your Honor, more important is that Mr. Ramirez was identified as the authorized tenant and pursuant to testimony by Leslie Sherman in the event that they found out there were three people living in the apartment, the unauthorized tenant or Israel Rodriguez would be asked to leave, not Roberto Ramirez. Last with respect to their argument on a chase, there was testimony advanced at trial that there was a chase by Roberto Ramirez of a young woman by the name of Allison Drake. Allison Drake testified and viewing her testimony most favorably to the plaintiff in this case testified that she was chased one evening, that the chaser was Roberto Ramirez, that this chase occurred prior to the murder of Melissa Barner and that she told her mother that someone in quote and quote chased her. Assume again, taking, but didn't her mother claim that she told Paquito or whatever the lady's name was who was in charge of the building. The mother said that she told that person and that that person would take care of it because according to the mother, who was also a tenant in the building, the building managers did not like tenants calling the police because they didn't want any police around the building. So the mother claims that by telling Paquito about the chase that that would be followed up on with the police. Wasn't there some testimony like that from Allison's mother? Your Honor, there was some testimony on that issue and taking the evidence most favorable to the plaintiff in this case. Assume that Barbara Drake did go to the Kisa and report this chase that was reported by Allison Drake. Take it a step further, your honors. Take it even though Barbara Drake unequivocally testified that nobody knew who this chaser was. Allison Drake viewing the evidence most favorable to the plaintiff said that she knew it was Mr. Ramirez. There was some question as to when she found that out, whether it was after the murder before, but assume for a second that she actually took the evidence or the complaint to Allison Drake. Assume that Kisa actually went to Allison Drake and followed up. The reality of the situation is in Illinois, in Illinois, there is no duty for the defendant or the landlord defendant, the landlord or landowner to assume any kind of duty. And in the event they do assume that they have to do so non negligently. Uh, and in this case there's no evidence whatsoever that we assumed any kind of duty to protect Melissa Dorman. I also know that the undertaking shall be, or the voluntary assumption of the duty, if there was one, shall be limited to the scope of the, uh, the undertaking. In this case, the scope of that undertaking would be to protect Allison Drake, not Melissa Dorman. Further, the conversation that took place unquestionably, uh, took place after Melissa Dorner had rented her apartment. Before you run out of time, I want to get to the other issue about the post trial motion. Absolutely. The oral one versus the written one. Absolutely. Now, now you claim that because the attorney made an oral post trial motion, that was his one shot. And the subsequent written motion is, is of no value. That's your argument, right? Your honor. What I contend is that the oral motion is a nullity and the written motion is the one that effectively counted pursuant to the law. Okay. And, and your honors, I do submit that I'm switching sides here. Sure. I was, I was looking at the other sites questions. Go ahead. But I do submit to the court that, uh, my eagerness got the best of me. And, uh, before the judgment was entered on the verdict, I certainly stepped up and presented an oral motion. I think Illinois law is unequivocal, not only by code, by Kate, but by case law that the oral motions are nullity. Well, you're one of the few lawyers who's ever admitted that his eagerness got the better of him. But then what does the oral, what, what does the oral motion do then? Well, if we all can concede, you only get one bite at the apple. Yeah. Your honor. Well, what the oral motion does is by virtue of the fact that it's a legal nullity, it's like it never happened at the trial court level. Judge Lynch acknowledged that he shouldn't have heard the motion. I admit I shouldn't have presented it. And I believe that Mr. Dunn would admit that he probably shouldn't have opposed it. Uh, it was, uh, it was an improper procedural, um, step, but it was harmless error. Uh, the Illinois code, uh, two dash 1202 requires a single post-trial motion to be written and file. You can't file an oral motion and you can't write something that you're talking about. So, uh, the reality is, uh, the only post-trial motion is the written motion. And I do want to know one other thing before I conclude. So your, your conclusion is your oral motion is a nullity and we shouldn't even be talking about it. Right. That is my, that is my contention. And, um, I do know that the oral motion did duplicate some of the arguments, but the reality is, uh, plaintiff, uh, argues that there was prejudice. And I would submit that there is no prejudice because of the rulings were consistently against the WRE defendants at the post-trial motion stage. Lastly, I do want to make mention, and I believe it's extremely important is that the issue of reliance, uh, Mary Pat Dorner testified volume 20 page 112 to 114 of her, uh, uh, testimony, uh, that,  she had a conversation with Pekiza about the rent and about the tenancy and about what she wanted for her daughter. And she ultimately based that conversation on the fact that, uh, this is why we're going to rent it. At no point within the trial testimony offered by Mary Pat Dorner, the only person that was available, did she ever say that the WRE defendants promised, promised her daughter safety, promised her daughter that we would follow up with tenant complaints and we would help you be safe in this building. At no point in time did the WRE defendants ever report that there was any kind of internal policies that were unwritten in nature that they would adhere to. And I would submit to the court that the purpose for the unwritten policies and procedures was simply to facilitate the management of the building. There's no evidence in the trial transcript. None that, uh, they were ever intended to protect against crime, much less crime against Melissa Dorner. Your honors, lastly, although I neglected to do this at the onset, I would ask for just a couple of minutes of rebuttal if your honors would be Oh yes, you'll get a few minutes of rebuttal. Thank you. You weren't listening carefully. I said, you always have a few minutes for rebuttal. Thank you. And before opposing counsel starts speaking, I see we have members of the audience who seem very uncomfortable because the cameras are beaming in on their faces and perhaps I could ask our attendant to close the curtains. Is there a tenant here? Where is it? Go ahead and wait for that to happen, judge. Go ahead and wait because then people will be distracted. There it is. Okay. Thank you. Thank you. Thank you. Go ahead. Good morning. Your honors. My name is Collin Dunn. May it please the court, I represent the plaintiff appellant in this case, Mary Pat Dorner. Judge DeWood, I think I want to jump in to the jurisdictional arguments that Collin Dunn, D-U-N-N. I think I want to jump into the jurisdictional argument, Judge DeWood, that you mentioned before. I just, I point out that even though counsel's admitted that he should not have made that oral motion and that it was a nullity, I'm sure that he would have had the motion have been granted by Judge Lynch, that he would not be agreeing that that was the nullity. The issue here is whether or not the defendants have found a loophole, which allow them to rehearse their arguments, hear my arguments, listen to the judge, the circuit courts ruling on those arguments, preview his thoughts and pin him down on his thoughts and their arguments, and then come back later and make a written motion trying to make sure that they broaden however they make, they may on those arguments. But Mr. isn't this sort of a no harm, no foul situation? If you didn't, or whoever was there for the trial, and if it was you or someone from your firm, also didn't jump up and down and say, oh no, you can't make an oral motion. It's got to be in writing. You shouldn't even think about this judge. You should just wait to see what comes in, in the file. They get one post trial motion and they opted to make it an oral motion. And so why is it my obligation to tell them you should make an oral motion versus a written motion? It's their option. They've lost the case. They're making a motion for J and O B. But the rule talks about filing a motion. And that word infers that it has to be in writing because you can't file something that's done orally. But that's for appellate purposes. Okay. So if you look at the Welsh case that we cited in our papers, they can file and present, an oral motion. You obviously cannot file an oral motion, but they can present an oral motion. This is tremendous hair splitting. The rules do talk about filing and I agree there's for appellate purposes, but also aren't these rules to be liberally construed to do a number of things. A, allow the trial judge to be able to control his courtroom and control the conduct of business in his courtroom and to allow the litigants to have a fair shake and have their day in court. So your strict construction of the rule would negate both of those things. Why should we do that? Well, remember that you only get the right to an appeal because the rules say you do. There's no constitutional right to an appeal in a civil case. The only reason you can appeal is because you followed the rules as written. And so here when you, when you opt and if you look at the transcript, there was a back and forth between Judge Lynch and counsel for the defendants on whether or not they're going to make an oral versus a written. The judge says, I'll do whatever you want me to do. And they opt for a written that they elected to do an oral. They elected to do an oral motion for the JNOB motion. And so there has to be some consequence for it because I can tell you if this court were to find a no harm, no foul, every lawyer is going to do this. I have a trial next week that if we lose the case, I will, I will do this because it's a great way for me to rehearse my arguments. Even though the Supreme Court in the Sears case says you should not be allowed to do that. It's a great way for me to hear my opponent's argument. It's a great way for me to hear what the judge is thinking about my arguments. And then I can come back with a written motion. And if the judge tries to veer off what he's said or she said, I can point out in the transcript, because you've already said X, Y, and Z. Why is that fair to the circuit court? The circuit court should be able to have a written motion presented to them. They should be able to look at the written transcript and make a decision then and there after considering all of that, what they should do. If you're going to opt for an oral motion, you're bound by your decision to do that. And there needs to be some consequence. Now, whether that be dismissing the appeal here, or whether that means that they're limited to whatever they argued in the oral motion, there should be some consequence. How do you file an oral motion? You can't. But there's no jurisdictional bar to the circuit court hearing that motion, considering that motion, and ruling out that motion. Anywhere along, before we got to the trial, was there any pre-trial practice where the Wilmette company tried to get out of the case and on the issue of the duty? Was there a summary judgment? There was a summary judgment motion. And it was denied by the motion judge or by Judge Lynch? It was the motion's judge, but it wasn't on the 22nd floor. It was once we got above the black line, there's a special judge that rules on those motions. But there was a motion judge that ruled on that motion. But again, you know, you can't, the rule says specifically, if you're going to make arguments like in a directive finding, you got to put those in your post-trial motion or they're waived. So simply the fact that they made a summary judgment motion on the issue of duty doesn't mean that, and we're not saying that they waived the argument of duty, but we're simply saying that they should either have been there. You can't appeal an oral motion. The denial of oral post-trial motion, or they're limited to what they argued in that oral motion. They can't come back now with a written motion and supplement what they've already said. I would point out too, that in my preparation for today, I found that there's a case in front of the Supreme Court, and now people will be Walker, and I can follow up with the court would like to, that talks about the issue of whether or not the court has, the circuit court has the power to consider a successive post-trial motion. So that was the second district case. And that's at 395 Illap 3rd, 860 the petition for leave to appeal was allowed in March, 2010. So that's actually been pending for quite some time. Is it a criminal case? It's a criminal case, but the issue that's been presented as I understand it is whether or not the circuit court has the power of jurisdiction to consider a successive post-trial motion. But first there would have to be a determination that this oral expounding or that your, your opposing counsel made was in fact the motion. He's basically saying it wasn't really emotion. It was just his exuberance and he, and it just came out and it really wasn't emotion. That's kind of what he's suggesting. So first we'd have to, the court, the Supreme Court would have to conclude in the, in, I don't know what the facts are of people versus walk Walker, but as I'm listening to this argument, your opponent is basically saying that wasn't really amount emotion. I was very excited about how things were going and it just kind of jumped out of my mouth. You know how that happens because the motion was denied. Okay. If the motion is granted judge, I'm sure as I said before, they would not be here admitting that that was a nullity in that they were wrong and they should have filed a written motion. So you have to go by what the record says and what they've done. You can't now concoct a reason why to exculpate yourself from where you made that motion. It's not fair to either side, the losing party or the winning party to allow that. Thank you. Let's sort of move on to the main issue here. Right. All right. If, if the, if the woman company had done what you believe it should have done, how would that have prevented this, this tragic occurrence? Well, they had several, what they were doing was a credit was, it appears to be essentially a credit check. Well, but that was their argument of trial, right? Their argument of trial was, this is just a credit check. Even though, frankly, if you looked at Mr. Halim's testimony, he admitted that it wasn't the sole purpose. It was the screening procedures that they had. The sole purpose was not to make sure that they could pay their rent. Can you outline for us what you think specifically, what were the acts that the defendants that WRE did that, that rose to the level, that created the duty? So first they have a procedure to screen tenants and they admit, we don't say that was completely for security purposes, but it was in part for security. And the reasons that you talked about Judge Cunningham and your questions to defendant counsel here, they asked for criminal background. Why would you ask that question? If at least some part of it wasn't related to security, they had a rule that if you provided any false information, that application would not be, would be rejected. Why would you have that rule? If, if in some, for some reason you think that that's a person that should not be in the building because of their character, they talk about, they want good non-destructive tenants, all of these things, you know, whether you disagree or the question is whether a reasonable jury could have heard this testimony and found, yes, this procedure was in part related to providing security to tenants like Melissa Dorner. And, you know, the background check, the fact that they didn't do it isn't what's important. The fact that she was told in the meeting by, with, with the onsite supervisor that they do do background checks is one of the reasons why she agreed to live in this building, why she opted for it. Everything. The only reason she lived in this building is based on what she had. They done the background check. I'm going to take all the facts favorably. Had they done the background check that the tenant interviewer claimed that Wilmette always did, and it was a very, very thorough background check. What if, would it have revealed anything about the murderer? Well, it would have revealed that they have no idea who this person is. And that's what the credit report indicated. It revealed that the, that the social security number that was provided was completely false. Here you had a person who was in their twenties who had worked at several different places before. And the credit report came back, no subject found. That should be a huge red light going off in your head that something's wrong here. And so they didn't follow up on all three of the people that were viewed here that were screened. All three of them came back, no subject found. So they have no idea who they're putting in this building. So let's, let's kind of skip ahead here. What you say is true. I've had an approximate cause for me because without that, you know, how, how is it, how is the failure to do the background check in this case related to the elements that you need to establish, to establish liability in this case? You wouldn't have been in the building if they would have followed their procedure. Because they have the ones that grant him access to the bill. They're the ones that'll give him the keys and say, you can live in this building. Here's your room. And, and if they would perform and follow their own policies with regard to attendance screening, they would never have allowed him to live in that building. And a reasonable jury could have certainly, I mean, there's no connection between Mr. Ramirez and Melissa Dorner, other than the fact that they were living in this building. They didn't know each other. They didn't work near each other with each other. The only reason they were together at all is because the defendants allowed him to live in that building. So that's the approximate cause is that had they followed their procedures, it would have the building. So Fort Knox like secure that people off the murderers off the street couldn't get in the building and just start going in knocking on doors. Well, we know there was a murder in the building prior to Melissa. We know that it's in the record, right? It's in the record. So I mean, but is that my question? Well, I mean, I guess that justice Cunningham asked about the proximate cause, right? And you answered it by saying, well, he would not have been in the building. All right. Right. Let's say he was not a tenant and he was just Joe, the murderer on the street. All right. And how would he have been prevented from getting in the building somehow? Well, I mean, yeah, the front door is locked. Okay. There's, that's my question. Yeah. The front door is locked. There's no public access to the building. You have to have a key to get through the front door and the keys given to you by the defendants. And Mr. Jim, one of the things we have to think about is public policy. When we're talking about the duty duties and interpreting court decisions, that we must follow. Right. And if, if we were to follow your lead on this case and affirm the verdict, all right, would not that have some kind of a chilling effect on property managers where they would simply not do any checks and say, you know, if we do no checks, then we're never going to get a million dollar verdict against us because we'll have no duty to, you know, we'll just let anybody come in and we'll only check to make sure they're employed. Well, I think they would limit their checks to just simply the credit checks. Okay. They would limit, they would limit it to, we're going to just check your credit. All we care about is can you pay the monthly rent? And if you can, then you're in. And then we wouldn't be able to be making these arguments that there was some security aspect to their tenant screening. But that's, that's, um, judge Deloitte's point. Doesn't that have, isn't that an impact on public policy? So you're not going to be able to, as a building owner or manager, you are no longer in a position of trying to screen, not just for credit worthiness, but for character. I assume that the buildings, the building owners have some sequence of, you know, you may have somebody who's perfectly economically able to pay the rent, but you don't want them living in the building because they're disruptive or they have a history of fights or whatever it is that would preclude looking into those things. And is that good public policy? I think that's justice Deloitte's point. Well, I think if I think I agree with you that they should be doing these background checks and I cannot believe that the landlord will look at this case and think, geez, if I do a background check and I'm wrong, then I'm going to get hit with a million dollar verdict. So I'm going to stop doing these background checks. People, people are not going to be living in buildings where they're doing absolutely no checks. I think the market wouldn't allow that to happen. But remember there's other evidence in addition to simply the tenant screening here. So if it was just the tenant screening issue, then maybe they would have a point. But here you have the attack on Allison Drake that, I mean, she, she would have been his first victim had he gotten a holder. And, and they're told that Allison Drake was attacked. My daughter was attacked and they knew nothing about it because their policy was according to the onsite supervisor, don't call the police. Tell me and we'll deal with it. I mean that I think that's a horrible house and the jury thought that's a horrible house. What does the record reveal about the identification of the would-be attacker on Allison that in fact was the same person? The record is that she says it's the same person. She knows that this person lives across the hall from her brother and she had seen him several times prior to the incident. She describes one time where he's laying in the doorway. What was the time span between the incident involving Allison and the incident involving Ms. Dorner? I think the testimony is a few months. So there was plenty of time for the defendants to have done something about it. Well, when did I think the question I had was when did she identify Ramirez? She did say, this is the guy that lives across the hall from my brother. I've seen him sitting in the doorway. Sometimes he beckons me into his apartment when I'm visiting my brother. When did she tell that to Paquiza? That's what I'd like to know. But she never told it to Paquiza. But the point is, is that per the policy, Paquiza was to follow up and ask Allison Drake. And if she said, who was this man? Allison Drake would have said, he lives across the hall from my brother. I've seen him numerous times. That would have led Paquiza directly to him. So it's playing a little fast and loose with the facts to say that she didn't know who he was. She didn't know his name, but she knew exactly where he lived. And that's all that was necessary for Paquiza to follow up on the complaint. I want to jump back to my question. When I talked about the time difference, and I did that for a reason. You said it was a few months and I'm sure we can drill into the record and get the exact dates. That's fine. And therefore, WOMEC could have done something about it. What would they have done? They would have bought a forcible entry and detainer case, right? And what would have been the breach of the lease? They would have cited it. And why do you think it would have gotten resolved in a couple months, given how successful people are at dragging evictions out? I don't really want to stay in the property. I don't know that that's the case, Your Honor, because first of all, if you look at the Joseph Gordon example, so the Joseph Gordon example is an example of how the policy should have been enforced. Remember, he was the fellow that there was complaints about people stealing. And so Mr. Lomascova staked him out, found him doing it, caught him red handed. He was barred from the building. So remember, Mr. Ramirez was not, he didn't sign the lease. He's not on the lease. So I don't know that they would have been required to file a forcible detainer action to evict him. But at the very least, if he's living there as the third tenant, all right, then I guess that's my question is he wouldn't be, he wouldn't be on the lease and therefore that might be a basis for it. Right. I mean, I don't know that they would have been required to file a forcible detainer action, but the point is, is that they confront him. I think, I think the point is, is that if they would have confronted him, told him, we know what happens, that's a deterrent. If they would have alerted the other people in the building, there's been this issue, there's been an attack. Let me know if there's been any other issues. That's a deterrent. All of these things, you know, the jury could have considered in deciding. Remember, they only assessed them 10% at fault. Okay. This is not a case where they gave them a hundred percent of fault. You're the only, you're the sole cause for this is, is the building's policies and procedures. They simply said, we agree with you that 10% of this is the responsibility of the landlord. The 90 other 90% was Mr. Ramirez. So, you know, I think that's an important thing to keep in mind. So in your mind, the fact that the keys that did no follow at all is, um, it's problematic because I mean, nobody knew who were mere at the time that this was really, that Alison related it to her mother. There was no exchange as to who this person was. It was just a guy chasing me. I was on the fifth floor and a guy came up the stairs and chased me. Well, we knew it could have been somebody from the outside, right? I mean, there was no discussion at that point as to who that person was. And you're saying that the building manager should have spoken with Alison to find out, was this somebody you'd seen before? Did you know the person or something? Right. Right. So, so Alison Fick knew who it was. She might not have known his name, but she knew where he lived. There was no identification made about who it was because Barbara Drake didn't know who it was. Alison Drake didn't know his name. So the point is, is that her negligence and following up shouldn't provide her a defense of the negligence that led to her death. That's, I guess that's the narrow question I'm asking. You're faulting her for not following up to get more information as to what occurred and who this person was, if Alison knew, right? Right. Because if you remember, if you look at Leslie Sherman's testimony, she described the policy and she says, you follow up, you talk to the people involved. If it turns out that there was an assault, you call the police. So have the keys have followed up, talk to Alison. Alison would have said, I don't know his name, but he lives across from my brother. You follow up, you find out that there was an attack based on Alison Drake's testimony and you call the police and the police get involved. Then you're not worried about this forcible detainer action or whatever else. Now the police are involved. And so, you know, the jury's easily could have found that that was that encompassed the 10% of fault that they assessed to the defendants in the case. I think the last thing I want to point out before my time is done is the reliance issue that Mr. Gokin mentioned in his remarks. There's a couple of facts that I think are important for the court to keep in mind in assessing that. Remember that Melissa at the time of this, her murder was 21 years old when she's looking for an apartment. Her folks are moving to Florida. She had been attacked at a previous or her last apartment and they had looked at five or six apartments before opting for this one. So the only reason, and she was told that they do background checks. So when you're talking about reliance, the jury could easily have found that the conversation that she had and Mary Pat, her mother had with Pekiza was what led her to choose to live in this building. Was there anything, I didn't see anything in the record that suggested that Pekiza assured Melissa and her mother about anything. I mean, she told her that there was, they said that they thought it was a nice building and what Pekiza say that led them to that conclusion, I don't know. But I think if you look at all those facts, you need to keep in mind because it puts the context, Mary Pat's testimony in context. She talks about talking about their concerns with Pekiza and they, and they go through the reasonable inference from this testimony is that whatever Pekiza said to her reassured them that this was a safe building. I think that's frankly the only reasonable inference from that testimony. Otherwise they would have done it. They felt like this wasn't a safe building. They would have opted for one of the other five that they looked at. So you remember this is a very tough standard for the defense to meet. And so all the inferences have to be in our favor. And I think a reasonable jury could have said, look, this girl had been attacked before. She's obviously concerned about her safety. Her parents are not going to be around. That's going to be something that's talked about in that conversation with Pekiza. You have testimony that their concerns were being discussed. So that had to be what they're talking about. There's nothing else that they could be talking about other than my daughter's safety in that conversation. Thank you. Thank you. Brief rebuttal, please. Emphasis on brief. Thank you. Your honors. Please support with respect to just extremely briefly on the nullity argument. And I trust that in the event our oral J and OV was granted, we would be standing here with the plaintiff filing the appeal saying that it was a nullity. The reality is case law and statute simply reflect and support our proposition that an oral motion is in fact a nullity and that you have to file a singular post-trial motion, which we have done. With respect to the background checks that have been discussed at length, what we need to remember is what the purpose and intent of the background checks were. They were to ensure a proper operation of the building and to ensure that we get worthy clients and tenants that would be able to pay their rent and do what we had hoped that they could do so that we can run an operation and run a business. Let me follow up on that. Sure. One of the best points I think the other side makes is that when this was done, the social security numbers didn't match and that should have been a red flag for you. And everyone knows who's ever dealt with a business knows about credit reports and anybody who got a mortgage and the social security number is the key to the whole process that links to a particular individual, gives you the credit history, whether you're delinquent on accounts, et cetera. And we have a lot of people in Chicago who might not have valid social security numbers. And here you get some people knocking on your door wanting to rent a unit. The social security numbers come up bad and you rented the apartment to them anyway. That's an excellent question. Your honors, in the event that Mr. Ramirez had informed the WRE defendants that he had no social security numbers to give, we same argument, we wouldn't be able to conduct the background check as counsel contends. Does that mean that any illegal immigrant that is here in a sanctuary city in the city of Chicago should be living on the streets? I don't believe that's appropriate. The reality is what the evidence presented is that there was no evidence of use to trial. So you're saying the social security art number is just really, not necessary. So then why do you ask people for it? What's the point of asking for it if you don't think it's necessary and it's not used for anything? We're asking them for the protection of our business operation to ensure that the tenants that we select to live in the building pay rent. But that, that answer makes no sense against the backdrop of the fact that this guy's social security number didn't match with his name, but you didn't do anything about it. So if the purpose for asking for the social security number is to ensure that the person is credit worthy and that they're telling you the truth and all of that, how do you reconcile that with the fact that in this case, this particular murderer turned out to have a social security number that wasn't his social security number and your clients knew it, but they didn't do anything. So what's the point of asking for it? I submit to the court that the evidence is devoid of any reference that at the time they approved the application that Mr. Ramirez that they knew that Mr. Ramirez did not have the social security number he provided. What it came back was no message found. Now when college kids across America go to college and they've never had credit, I trust that the same message would be found that they have no credit. That doesn't. So let's just pin this down. So if we were to go plowing through the 20 volumes of the record on this issue, what the record, you're telling us what the record is going to say is that there was simply no matching number found as opposed to, or in counter distinction to that the number provided does not match this individual. It actually goes to a different individual. That is absolutely what I'm telling you, Your Honor. Said no subject found. No subject found. And in fact, the WRA defendants had no knowledge that Mr. Ramirez was not the person he said he, in fact, they followed up with the application, were able to talk to past landlords, employers that were able to verify employment, income and so forth. So with that said the purpose of these internal procedures, these applications and these occupancy procedures are to ensure the operation of the building. There is no duty. And in the trial record there was no assumed duty. The fact that Bikiza Lemonoska heard of a complaint and did nothing indicates that there was no duty. She was under no duty to do anything. And furthermore, to be responsible or be held liable for non-feasance, there has to be reliance upon the party trying to invoke it. Here, this 21 year old lady, Mrs. Dorner, never once was told during this conversation with Mrs. Lemonoska that we would do anything about internal unwritten policies or procedures regarding application procedures, occupancy, chases, or anything. And in fact, I draw your attention to volume 20 of page 12. This summarizes the conversation between Mary Pat Dorner and the WRU defendants. The singular conversation was testified at trial and the only thing that the jury heard was that we discussed kind of most of the obvious things, you know, lease time, like day to day, when your payments are going to be like just asking general questions, you would ask anybody to rent an apartment. And then of course, what kind of application needed to be filled out? And you know how much that would cost and what the lease required and that background check, period. There's no reference of a criminal background, but there's no evidence of a criminal history by the remerits. There's no reliance. There's no promise. There's no liability. And on behalf of the WRU defendants, I respectfully request that the judgment notwithstanding the verdict or against the WRU defendants during trial be reversed and vacated and that you rule in favor of the WRU defendants accordingly. Thank you. Okay. Thank you. This matter will be taken under advisement. And as soon as these.